**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**FRANCELLA IVERY,**

             **Plaintiff,**         **CIVIL ACTION NO. 12-cv-13295**

    **vs.**

                             **DISTRICT JUDGE NANCY G. EDMUNDS**

**COMMISSIONER OF**         **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

             **Defendant.**
_____/

## REPORT AND RECOMMENDATION

Plaintiff Francella Ivery seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to social security benefits for her physical impairments under 42 U.S.C. § 405(g).  (Docket no. 1.)[1] Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 14) and Defendant's Motion for Summary Judgment (docket no. 17).  The matter has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (Docket no. 4.)  The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

_____

[1]Plaintiff's pro se Complaint does not set forth the legal grounds under which Plaintiff seeks review of Defendant's decision.  Instead, Plaintiff's Complaint alleges that she initially filed her disability claim in 1992 and was ultimately approved for benefits in 2001.  Nevertheless, she claims that she has not received the correct payments.  (Docket no. 1.)  The uncommonly complex procedural history of Plaintiff's adventure through the social security administration is set forth herein, but, for purposes of this Report and Recommendation, the Court will assume that Plaintiff intended to challenge the Defendant's decision under 42 U.S.C. § 405(g).

I.      **RECOMMENDATION:**

This Court recommends that Plaintiff's Motion for Summary Judgment (docket no. 14) be DENIED and Defendant's Motion for Summary Judgment (docket no. 17) be GRANTED.

II.     **PROCEDURAL HISTORY[2]:**

Plaintiff filed her initial application for Supplement Security Income disability benefits (a "Title XVI" or "SSI" application) on October 30, 1992, alleging disability due to back problems and carpal tunnel syndrome beginning on February 9, 1992. (*See* TR 91, 93.) Plaintiff's Title XVI claim was initially denied on March 3, 1993, and an ALJ issued an unfavorable decision on July 26, 1994. (*See* TR 26, 93-94.) On February 1, 1995, the Appeals Council upheld the decision. (*See* TR 26.)

At issue in the present matter is Plaintiff's application for Disability Insurance Benefits under the Social Security Act (a "Title II" or "DIB" application), which she filed on November 28, 2001, again alleging an onset date of February 9, 1992. (*See* TR 26.) This Title II claim was initially denied because Plaintiff's date last insured was September 30, 1994. (*See* TR 26, 93-94.)

On July 13, 2004, Plaintiff filed a Second Title XVI claim alleging an onset date of July 29, 1997. (TR 107 (noting that "[t]he only benefit I'm entitled to is SSI").) While not entirely clear

_____

[2]From the outset, this matter has been mishandled to the extent that even the two Administrative Law Judges discussed in this section incorrectly set forth the procedural history. For example, in his August 11, 2009 decision, ALJ Christensen began his discussion as follows: "On October 30, 1992, the claimant protectively filed a Title II application for a period of disability insurance benefits, alleging disability beginning July 29, 1997." (TR 26.) Clearly, Plaintiff could not have filed a claim for benefits five years before her alleged onset date. And in his September 1, 2011 decision, ALJ Greenberg notes that "[t]he claimant is alleging disability since November 19, 1992." (TR 10.) While more accurate than ALJ Christensen's alleged onset date, ALJ Greenburg's decision is also problematic as Plaintiff's protected filing date was, in fact, October 30, 1992 – nearly three weeks earlier. Again, Plaintiff could not possibly have filed a claim for benefits *before* her alleged onset date. As set forth herein, Plaintiff's actual alleged onset date, as ultimately determined by the social security administration nearly 14 years later, was February 9, 1992. (*See* TR 26.)

from any information included in the transcript, it appears that Plaintiff's second Title XVI application was granted, and Plaintiff began receiving benefit payments sometime in 2007.  (*See* TR 231; *see also* docket no. 17 at 12.)

On March 24, 2006, while Plaintiff's Second Title XVI application was pending, the social security administration determined that it had erroneously denied Plaintiff's Title II application. (*See* TR 91-94.)  Thus, Plaintiff's application was reopened for a medical determination, and although she filed her application on November 28, 2001, she was afforded a protective filing date of October 30, 1992, due to the same February 9, 1992 alleged onset date as her initial Title XVI application.  (*See id.*)  On March 19, 2007, Plaintiff's Title II application was denied on medical grounds; reconsideration was denied on June 13, 2007.  (*See* TR 26.)

Plaintiff requested a de novo hearing, which was held before Administrative Law Judge John Christensen on July 28, 2009.  (*See* TR 226.)  Noting that Plaintiff had provided no new evidence, ALJ Christensen determined that her application was barred by the doctrine of *res judicata*, apparently because Plaintiff's "rights on the same facts and on the same issue or issues" in this Title II application had already been determined as part of her first Title XVI application.  (TR 26-28.) Plaintiff appealed ALJ Christensen's decision, and the Appeals Council remanded the matter, ordering that the ALJ give consideration to specific medical opinions of record, evaluate Plaintiff's complaints, make a determination of Plaintiff's Residual Functional Capacity (RFC), and if necessary, obtain testimony from a Vocational Expert (VE).  (TR 21-22.)  The Appeals Council did not specifically address the issue of *res judicata*.

On Remand, this matter was referred to ALJ Mark B. Greenberg, who held a second de novo hearing on August 19, 2011.  (*See* TR 237.)  At the hearing and in his opinion, ALJ Greenberg noted that denial on *res judicata* grounds appeared to be appropriate, but "in light of the [Appeals

3

Council's] remand order, the case proceeded to the merits." (TR 10.)  Ultimately, ALJ Greenberg found that Plaintiff was not entitled to Title II benefits because, between her alleged onset date (November 19, 1992)[3] and her date last insured (September 30, 1994), she was capable of performing a significant number of jobs in the national economy. (TR 12-18.)  The Appeals Council declined to review the ALJ's decision, and Plaintiff commenced the instant action for judicial review.  Plaintiff, however, does not directly challenge the ALJ's decision.  Instead, she appears to argue that because her Title XVI application was ultimately granted in 2007, her 2001 Title II application should also be granted.

## III.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A.    Plaintiff's Testimony[4]

Plaintiff was 54 years old at the time of the administrative hearing and 34 years old at the time of alleged onset.  (*See* TR 242.)  She has a high-school diploma and was receiving SSI disability payments at the time of the administrative hearing.  (TR 242.)  Plaintiff testified that from

---

[3]As noted, the alleged onset date of November 19, 1992, selected by ALJ Greenberg was incorrect.  November 19, 1992, was the day that Plaintiff had spinal fusion surgery, and ALJ Greenburg explained that Plaintiff "alleges disability due to neck surgery." (TR 14.)  But Plaintiff alleged an onset date of February 9, 1992, and had surgery in an attempt to alleviate her symptoms.  Thus, on the surface, it does not appear that ALJ Greenburg reviewed Plaintiff's claims through the correct dates.  Nevertheless, the Court finds that this was harmless error.  Having reviewed the medical records in this matter, and as discussed herein, it appears that ALJ Greenberg considered all of the relevant medical evidence from February 9, 1992, through September 30, 1994, when making his determination.  (*See* TR 14.)  Therefore, for purposes of this Report and Recommendation, the Court will consider the ALJ's decision in light of Plaintiff's February 9, 1992 alleged onset date and will assume that ALJ Greenberg did the same.

[4]Plaintiff testified briefly at her July 28, 2009 hearing in front of ALJ Christensen, but such testimony is not relevant to this Court's review of ALJ Greenberg's decision.  Thus, the testimony set forth herein is taken from Plaintiff's August 19, 2011 hearing (TR 237-260).

2:12-cv-13295-NGE-MKM   Doc # 18   Filed 07/11/13   Pg 5 of 17   Pg ID 323

the mid-1970s through November of 1992, she worked as a maintenance person for various businesses, where she would vacuum and generally clean up. (TR 248-50.) She testified that her job included lifting over 20 pounds regularly and that it included a lot of bending, stooping and twisting. (TR 249.) In early 1992, however, Plaintiff began having neck and back problems, so she took time off of work. She had not worked since her surgery in November 1992. (TR 243.)

Plaintiff explained that her neck and back problems began with paralysis and numbness on her left side. She told the ALJ that the problem got so bad that she had to have surgery on her neck in November 1992, and following the surgery, her condition improved, but she still had problems. (TR 243.) Specifically, Plaintiff stated that the surgery kept her out of a wheelchair but did not relieve the pain. (TR 246.) Plaintiff testified that she could stand, but her legs would drop out from under her, and her arms and hands were both numb. (TR 243.) She testified that her doctors gave her gloves to wear when her hands became really painful. She further testified that she had been that way throughout the 19 years following her surgery. Plaintiff also indicated that she had balance problems before her surgery but that those had been resolved, and she testified that she could not twist her neck. (TR 244.) She told the ALJ that the pain was about an eight on a ten-point scale, and she took ibuprofen for relief. (TR 245.) She also testified that she had headaches every week or so that least two or three days. She had to lay down to relieve her pain. (TR 248.)

Plaintiff testified that she did a little bit of cooking and cleaning, but her nieces took care of her. (TR 244.) She further testified that she could drive, but she generally avoided doing so because it hurt her to turn her head. (TR 247.)

### B.    Medical Record

Records from Saginaw Cooperative Hospitals indicate that Plaintiff initially presented to the hospital emergency room sometime in February 1992 complaining of neck pain and bilateral arm

5

pain, including numbness in her extremities.  (*See* TR 183.)  Plaintiff was given a "soft collar" and told that she had a pinched nerve.  (TR 183.)  She returned for a follow-up on March 11, 1992, with Dr. Michael Biggs.  (TR 183-84.)  Dr. Biggs opined that she had "possible right carpal tunnel syndrome" and ordered an EMG of her right upper extremity.  (TR 182.)   Plaintiff returned on April 1, 1992, at which time Dr. Briggs noted that the EMG confirmed right carpal tunnel syndrome.  (TR 182.)  He then referred Plaintiff to Dr. Waheed Akbar, an orthopaedic surgeon.

Later that week, Plaintiff returned to the emergency room with neck pain and pain between her shoulder blades, as well as numbness and tingling in her right arm.  (*See* TR 182.)  Plaintiff returned on April 7, 1992, for a follow-up appointment with Dr. Briggs where he opined that she was experiencing paravertebral muscle spasms and that "a lot of her shoulder and neck discomfort [was] probably referred pain from [her wrist]."  (TR 181-82.)  Dr. Briggs prescribed Vicodin for Plaintiff's pain.  (TR 181.)  Plaintiff returned again on April 10, 1992, with similar complaints.  (TR 181.)  Dr. Briggs switched Plaintiff's prescription to Flexeril.  (TR 181.)

Plaintiff presented to Dr. Akbar on April 27, 1992, with continued complaints of tight muscles in her neck, shoulders, and arms, and cramps in her neck and back.  (TR 172.)  Plaintiff told Dr. Akbar that she had been experiencing pain in her arms and neck for three to four weeks.  Dr. Akbar's report indicates that Plaintiff had seen a "Dr. Jurardo" in March 1992 for a nerve conduction study in her right wrist and that she had a cervical spine X-ray on April 10, 1992, which showed some degenerative changes.  Dr. Akbar diagnosed Plaintiff with degenerative disc disease of the cervical spine and right carpal tunnel syndrome.  (TR 172.)

With Dr. Akbar's referral, on June 22, 1991, Plaintiff met with Dr. Bon Jung, a neurologist, for an EMG and nerve conduction study related to her left-hand numbness.  (TR 170.)  Dr. Jung diagnosed her with left carpal tunnel syndrome.  (TR 170.)

6

On July 13, 1992, Plaintiff returned to Dr. Akbar with more problems in her arms.  Dr. Akbar noted that she "seems to be intact" neurologically and that she had no gross distal neurovascular deficits.  He opined that she had cervical disc disease with radiculopathy, and he recommended a neurosurgical consult.  (TR 173.)

On September 17, 1992, Plaintiff returned to Saginaw Cooperative Hospitals and saw Dr. Mark Weidemann for a sore throat and swelling in her neck.  (TR 181.)  Dr. Weidemann inspected Plaintiff's vocal cords and noted that she likely had overuse laryngitis.  (TR 180.)

On September 28, 1992, Plaintiff presented to Dr. Akbar with continued complaints of neck pain and numbness.  (TR 169.)  Dr. Akbar noted that she was becoming "more symptomatic," and he ordered an MRI of the cervical spine.  (TR 169.)  Plaintiff underwent the MRI on October 12, 1992, which showed dominant disc herniation C5-C6, which resulted in thecal sac deformity and cord compression.  The MRI also showed disc herniation at C4-C5 and some bulging at C3-C4.  (TR 174.)

Plaintiff returned to Saginaw Cooperative Hospitals on October 23, 1992, and saw Dr. Nehal Tawansy with complaints of pain in her shoulders, neck, and upper back, and complaints of pain and numbness in both hands.  Dr. Tawansy noted that Plaintiff's range of motion in her shoulders and back were "normal."  (TR 180.)  He also noted that her muscle strength and deep tendon reflexes were "normal."  (TR 179.)  Dr. Tawansy opined that Plaintiff's continued troubles were "probably due to degenerative disc disease of cervical spine" and "[c]arpal tunnel syndrome[,] right wrist." (TR 179.)  Plaintiff asked for "time off work" to rest, so Dr. Tawansy wrote a note indicating that Plaintiff needed one week off.  (TR 179.)  On November 3, 1992, Plaintiff returned to Dr. Tawansy and requested an additional two weeks off of work.  (TR 179.)  Based on that examination, Dr. Tawansy completed a form noting that Plaintiff was "unemployable . . . until after surgery."  (TR

7

178.)

On or about November 16, 1992, Plaintiff presented to St. Mary's Medical Center with "rapidly progressing" problems with balance and pain. (TR 199, 201.) She met with Dr. Gerald Schnell, who opined that Plaintiff had "[p]artial spinal cord syndrome . . . with a very large disk herniation at C4-5 and C5-6 with progressive problems. (TR 200.) He recommended immediate surgery, and on November 19, 1992, Plaintiff underwent anterior cervical diskectomy and interbody fusion. (TR 194.)

Following the surgery, Plaintiff's condition was "considerably improved." (TR 194.) "[S]he had good relief of her severe radicular arm pain and some of the numbness," and her balance improved as well. (TR 194.) She was discharged from the hospital on November 23, 1992, and was asked to follow up with the hospital. (TR 194.) In a March 1, 1993 follow-up, a Dr. G.D. Buzon, Jr., also with St. Mary's Medical Center, noted that Plaintiff's "[a]lignment [was] well maintained," but there was "some limitation in the flexion studies, . . . which could be related to recent surgery." (TR 205.) On March 8, 1993, Dr. Schnell noted that Plaintiff had shown "considerable signs of improvement," but "[s]he still has some difficulty," so he recommended physical therapy and a job function analysis. (TR 192.) Plaintiff continued to see her doctors for follow-up appointments through at least March 12, 1998, with continued complaints of back and neck pain and the inability to walk. (*See* TR 186-91.)

After her Title II application was reinstated, Plaintiff's records were reviewed by two consultative medical examiners, Kevin Salk and Stephanie McPherson. (TR 209-217; 218-225.) The consultative examiners both determined that Plaintiff could lift no more than five pounds, could not perform repetitive pushing or pulling, and required a sit/stand option. (TR 210, 219.) They further opined that Plaintiff could frequently balance, occasionally stoop or crouch, and never climb

8

ladders, ropes or scaffolds or kneel, crawl, or squat. (TR 211, 220.) They opined that Plaintiff could perform no repetitive grasping or gripping, and they agreed that Plaintiff should avoid working around vibration, and hazards, such as moving machinery. (TR 212-13, 221-22.) They each noted that the prior RFC decision in Plaintiff's Title XVI case was an accurate reflection of Plaintiff's functional capacity on the dates in question. (TR 214, 223.)

### C.    The Vocational Expert

The ALJ asked the VE to consider a hypothetical person of Plaintiff's age and education who was limited to sedentary work with no lifting of more than five pounds. The ALJ asked the VE to assume that this person required a sit/stand option, could perform no repetitive pushing or pulling, could frequently balance, could not climb ladders, ropes, or scaffolds, could not kneel, crawl, or squat, could occasionally climb ramps or stairs, could occasionally stoop or crouch, could handle no repetitive gripping or grasping, and must avoid all exposure to vibration or hazards such as heights and machinery. The ALJ asked the VE if such a person could perform any of Plaintiff's past relevant work; the VE answered "no." (TR 256.)

The ALJ then asked the VE if such a person could perform any other work. The VE testified that such a person could perform work as an inspector/checker, a packer, or a bench assembler. The VE further testified that these positions included 6,500 jobs in Michigan and 195,000 jobs nationwide. (TR 256-57.) The VE also noted that there were other jobs available and that these were only examples. (TR 257.)

The ALJ then asked the VE to assume that such a person could not operate leg controls with her left leg and could not frequently operate controls bilaterally. The VE testified that such a limitation would preclude all work except for limited jobs as a surveillance systems monitor, which provided for 500 jobs in Michigan and 15,000 jobs nationwide. (TR 257.) The ALJ also testified

that a limitation on extreme neck movement would not change her response to any of the hypothetical questions.  (TR 259.)  Responding to a question from Plaintiff's attorney, the ALJ further testified that a person would be precluded from all work if they were required to miss two days a week due to pain and discomfort.  (TR 258.)

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff last met the insured status requirements under the Act on September 30, 1994, and that she had not engaged in substantial gainful activity from her alleged onset date of November 19, 1992,[5] through her date last insured.  (TR 12.)  The ALJ found that Plaintiff suffered from severe cervical myelopathy, degenerative disc disease, herniation, and carpal tunnel syndrome; but her impairments did not meet or medically equal any of those listed in the Listing of Impairments.  (TR 13.)  After considering the record, the ALJ found that Plaintiff had the residual functional capacity as follows:

> [Plaintiff could] perform sedentary work . . . with occasional or frequent lifting and/or carrying of no more than 5 pounds.  The claimant required a sit/stand option.  She could not have performed repetitive pushing or pulling.  The claimant could have frequently balanced.  She could never have climbed ladders, ropes, or scaffolds.  She could not kneel crawl or squat.  She could occasionally climb ramps, climb stairs, stoop, and crouch.  She could not have performed repetitive gripping or grasping.  She must have avoided all exposure to vibration or hazards, such as heights and machinery.

(TR 13.)  Thus, after reviewing the VE's testimony, the ALJ found that Plaintiff could perform a substantial number of jobs that exist in the national economy.  (TR 16-17.)  Therefore, she was not disabled under the Social Security Act at any time through September 30, 1994, her date last insured.  (TR 18.)

---

[5]Likewise, the Court finds no record that Plaintiff was engaged in substantial gainful activity under the act from February 9, 1992, Plaintiff's actual alleged onset date, through November 19, 1992, the date of her surgery.

10

## V.   LAW AND ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.   Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step

11

sequential analysis.  In the first four steps, Plaintiff was required to show that:

    (1)    Plaintiff was not presently engaged in substantial gainful employment; and

    (2)    Plaintiff suffered from a severe impairment; and

    (3)    the impairment met or was medically equal to a "listed impairment;" or

    (4)    Plaintiff did not have the residual functional capacity (RFC) to perform relevant past
           work.

*See* 20 C.F.R. § 404.1520(a)-(f).  If Plaintiff's impairments prevented Plaintiff from doing past work,

the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work

experience to determine if Plaintiff could perform other work.  If not, Plaintiff would be deemed

disabled.  *See id.* at § 404.1520(g).  The Commissioner has the burden of proof only on "the fifth

step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203

F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial

evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v.*

*Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence"

may be in the form of vocational expert testimony in response to a hypothetical question, "but only


'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"

*Id.* (citations omitted).

    **C.    Analysis**

    The Social Security Act authorizes "two types of remand: (1) a post judgment remand in

conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a

sentence-four remand); and (2) a pre-judgment remand for consideration of new and material

evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six

remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).

As noted, Plaintiff's pro se Complaint does not set forth the legal basis for the Court's review of this matter. Instead, Plaintiff apparently believes that she is entitled to Title II benefits from February 1992 through September 30, 1994, because she was ultimately granted Title XVI benefits. (*See* docket no. 1 and docket no. 14.) But Plaintiff misinterprets Defendant's findings. Plaintiff was granted Title XVI benefits for a period beginning in 1997, and her last insured date for Title II benefits was September 30, 1994. Thus, Defendant's Title XVI finding has no bearing on her instant claim. To the contrary, her Title XVI application for the period in question was *denied*. Nevertheless, for purposes of this Report and Recommendation, the Court will assume that she is challenging Defendant's medical determination, and because the ALJ's decision at Steps 1-3 favored Plaintiff, the Court will confine its analysis to a review of the ALJ's Step 4 and Step 5 determinations.

### 1.     The ALJ's Step-4 Finding; Plaintiff's RFC

The ALJ began his discussion of Plaintiff's RFC by considering Plaintiff's allegations of pain and limitations from her testimony at the August 19, 2011 hearing. (*See* TR 14.) The ALJ then discounted some of Plaintiff's statements concerning her symptoms as not fully credible because they were not consistent with his ultimate RFC finding. (TR 14.)

13

In support of his conclusion that Plaintiff's statements were not fully credible, the ALJ discussed Plaintiff's medical record as set forth herein.  (*See* TR 14.)  He noted that Plaintiff initially complained of neck pain, pain in her arms, right-side numbness, and leg weakness, as well as progressive problems with balance.  He discussed Plaintiff's MRI results, and her continued symptoms throughout 1992.  Nevertheless, the ALJ put considerable weight in Plaintiff's "marked improvement" following her surgery.  (TR 14-15.)  He noted that her balance was improved, her numbness was gone, she was neurologically stable, and she was ambulating well.  The ALJ acknowledged that Plaintiff's symptoms continued to a limited degree, but he found that her continuing symptoms did not support disabling pain, "but rather tend to support the limitations in the [RFC] of sedentary exertion with the additional limitations indicated."  (TR 15.)  The ALJ also discussed Plaintiff's carpal tunnel syndrome and noted that he accounted for the full weight of her alleged impairment in his RFC "by limiting the claimant to no repetitive gripping or grasping."  (TR 15.)  Further, the ALJ noted, an RFC "is not based upon the claimant being pain-free, but rather is based on her ability to do work activities . . . on a sustained basis despite limitations, such as pain, from her impairments."  (TR 15.)

The ALJ then considered the opinions of Mr. Kevin Salk and Ms. Stephanie McPherson, as the Appeals Council ordered.  (TR 15.)  The ALJ noted that these individuals were not "medical consultants," but he also found that their opinions were "consistent with the objective medical evidence."  (TR 15.)  The ALJ discussed each of their opinions in detail and afforded their RFC determinations "great weight."  (TR 15-16.) He also reviewed an opinion from a "Dr. Brooks," who appears to have been one of Plaintiff's attending physicians in November 2003, in which Dr. Brooks opined that Plaintiff was "permanently disabled."  (*See* TR 16.)  As the ALJ noted, however, such

14

an opinion is an issue reserved to the Commissioner.  (TR 16 (citing 10 C.F.R. § 404.1527(e)).)
Thus, he gave the opinion "very little weight."

An ALJ "may find all, only some, or none of an individual's allegations to be credible" and
may also find the statements credible to a certain degree so long as the ALJ properly sets forth the
basis for determining Plaintiff's credibility.  SSR 96–7p.  Here, the ALJ found that Plaintiff's
statements were not credible, and the Court can find no fault in the ALJ's analysis of Plaintiff's
subjective complaints.  Moreover, the ALJ appears to have properly weighed the medical and
opinion evidence of record.  The Court has found no evidence to conflict with the ALJ's RFC
finding.  And although the Court may not agree with the ALJ's finding, it is supported by substantial
evidence.

### 2.    The ALJ's Step-5 Finding

In making his Step-5 finding, the ALJ relied on the testimony of the VE.  In a hypothetical
question posed to the VE, an ALJ is required only to incorporate those limitations that he finds
credible and supported by the record.  *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d
1230, 1235 (6th Cir. 1993).  Here, the ALJ presented all of the limitations of the RFC in his
hypothetical questions to the VE, and the VE testified that there are jobs available for a person with
these limitations.  (TR 83-85.)  Plaintiff's attorney questioned the VE as well.  (TR 85.)

The ALJ then applied the VE's testimony in determining whether there were a significant
number of jobs available in the economy that Plaintiff could perform.  The VE testified without
qualification that Plaintiff could perform at least 6,500 jobs in Michigan and 195,000 jobs
nationwide.  (TR 256-57.)  Although there is no "magic number" that constitutes a significant
number of jobs, the Court finds that the ALJ's decision here is adequately supported.  *See Hall v.
Bowen, 837 F.2d 272, 274-75* (6th Cir. 1988) (finding that 1,350 to 1,800 jobs is a significant

15

number of jobs available).  There is no challenge to the reliability of the VE's testimony or any other reason to discount the ALJ's reliance on the VE's testimony regarding the number of available jobs. The ALJ's findings at step five are supported by substantial evidence.

## VI.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 14) should be DENIED, and Defendant's Motion for Summary Judgment (docket no. 17) should be GRANTED.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

16

Dated: July 11, 2013          s/ Mona K. Majzoub                        
                              MONA K. MAJZOUB
                              UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

      I hereby certify that a copy of this Report and Recommendation was served upon Francella Ivery and Counsel of Record on this date.

Dated: July 11, 2013          s/ Lisa C. Bartlett          
                              Case Manager